UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

EFFAT S. EMAMIAN,                                    :        07  Civ. 3919

                     Plaintiff,                        :

                               :        **AMENDED**
         -against-                                          **COMPLAINT**

                               :

ROCKEFELLER UNIVERSITY                              :        PLAINTIFF DEMANDS
                                        TRIAL BY JURY

                               :

               Defendant.                          :

-------------------------------------------------------------------x

      Plaintiff, Effat S. Emamian, by her attorneys, Liddle & Robinson, L.L.P.,

for her Amended Complaint against Rockefeller University alleges as follows:

<u>THE PARTIES</u>

      1.      Plaintiff, Dr. Effat S. Emamian, resides at 400 East 70th Street,

Apt. 1205, New York, New York. Dr. Emamian has been employed by Defendant,

Rockefeller University ("Rockefeller") from on or about March 2004 until the present.

She currently holds the position of Research Assistant Professor in the Laboratory of

Molecular and Cellular Neuroscience in New York City.

2.    Upon information and belief, Rockefeller University is a nonprofit New York educational and research institution with its principal place of business located at 1230 York Avenue New York, New York.

## NATURE OF THE ACTION

3.    This is a civil action for damages and remedies brought on behalf of the plaintiff for violations of Title VII, the New York City Human Rights Law §8-107 and New York State Executive Law § 296 et seq. ("New York State Human Rights Law"); and retaliation under Title VII, New York City Human Rights Law §8-107(7), and New York State Executive Law § 296 et seq. and 42 U.S.C. §1981 ("Civil Rights Act of 1866"). Specifically, Defendant's discriminated against Dr. Emamian because of her sex, race, religion and national origin and retaliated against her by, among other things, refusing to renew her appointment, refusing to consider her for a tenure-track faculty position, and refusing to rectify its improper behavior after Plaintiff complained about the discriminatory behavior that she had experienced.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction of this action under 28 U.S.C. §§ 1331 and 1367(a).

5.    Dr. Emamian filed a Charge of Discrimination under the Title VII provisions with the United States Equal Employment Opportunity Commission ("EEOC") on March 2, 2006. (a copy is attached as Exhibit A.)[1]

6.    Dr. Emamian received a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC") on February 20, 2007 (attached as Exhibit B).

7.    Venue is proper in this district under 28 U.S.C. § 1391(b), because the Southern District of New York is a district in which Rockefeller University resides and because a substantial part of the events giving rise to Plaintiff's claims occurred within the Southern District of New York.

FACTS

8.    Dr. Emamian is an Iranian Muslim female.

9.    Dr. Emamian earned a degree in 1997 in Psychiatry from the University of Tehran, Iran.

10.    Dr. Emamian works in the field of neuroscience focusing on schizophrenia. She has published articles in the magazines *Neuron* and *Nature Genetics* that have been cited by other researchers in her field. Several scientists, such as Henry Paulson, Albert R. La Spada and J. Paul Taylor, Nathanial Heinz, and Jaochim Hallymayer have cited Dr. Emamian's work in their own articles - which were published in other scientific journals

---

[1] Dr. Emamian also filed a Charge of Retaliation with the EEOC on May 18, 2007.

- regarding the impact of her work; she has been cited by over 100 scientists worldwide. Additionally, her findings have been discussed in the "News and Views" section of *Nature* and her published findings have been reproduced worldwide. Prior to working at Rockefeller University Dr. Emamian completed two separate postdoctoral studies at the University of Minnesota.

**<u>Dr. Emamian joins Rockefeller and Dr. Greengard's Laboratory</u>**

11.    Dr. Emamian joined Rockefeller in September of 2001 as a postdoctoral fellow.

12.    Dr. Emamian was promoted to Research Associate in September of 2003.

13.    In March of 2004, Dr. Paul Greengard recruited Dr. Emamian to join Rockefeller University's Laboratory of Molecular and Cellular Neuroscience as a Research Assistant Professor.

14.    Throughout her employment with Rockefeller, Dr. Emamian has been qualified for the positions that she has held and has performed her duties in a professional and competent manner.

15.    During Dr. Greengard's recruitment of Dr. Emamian he promised that she would be provided the support necessary to complete the research studies that she had proposed, and that Dr. Greengard had approved, during her employment interviews.

**Dr. Greengard discriminates against Dr. Emamian**

16.    Shortly after beginning work in Dr. Greengard's laboratory, Dr. Emamian noticed that she was being treated in an unfair and discriminatory manner. Although Dr. Emamian was the senior-most researcher (in terms of academic ranking) in the laboratory, she was treated as if she was junior to less-senior male associates.

17.    For instance, Dr. Greengard did not provide her with her own office space, although male employees of lower academic rank were provided with office space. One male employee was offered an empty office next to Plaintiff's workplace, even though he already had his own office and Dr. Emamian had specifically requested the office that he was given.

18.    Dr. Emamian requested to be allowed to work on Dr. Greengard's grants and to serve as the Principal Investigator on his projects, but soon found that only male employees, of lower academic rank, were allowed to serve as the Principal Investigator on Dr. Greengard's grant proposals.

19.    Dr. Emamian was not initially provided with a lab technician while male employees of lower academic rank were allowed one or more technicians to assist them.

20.    Postdoctoral researchers ("postdocs") whom she had interviewed and who expressed interest in her projects, were never assigned to her. In fact, shortly after joining the lab, Dr. Greengard revoked Dr. Emamian's rights to interview postdocs.

21.    Upon information and belief, Dr. Emamian's salary was lower than that of lower-ranking male employees.

22.    Dr. Greengard did not treat Plaintiff with the same level of respect with which he treated his male employees.

**Dr. Greengard orders Dr. Emamian to stop working on her projects**

23.    In or about, October/November of 2004, approximately six months after beginning work on a project involving human tissue that Dr. Greengard had previously approved, Dr. Greengard ordered Plaintiff to stop work on it. When Dr. Emamian asked for an explanation, Dr. Greengard refused to provide one. Upon information and belief, other male colleagues in the lab still were allowed to continue working on their work on human tissue.

24.    Dr. Emamian obeyed Dr. Greengard's orders and immediately stopped working with human tissue even though it meant that she would be unable to complete the experiment.

25.    Dr. Greengard also insisted that Plaintiff stop work on a project involving the generation of transgenic mice. Dr. Greengard had approved this project at the beginning of Dr. Emamian's tenure, along with Dr. Shiaoching Gong from the Gene Expression Nervous System Atlas ("GENSAT")[2] – the entity that was responsible for

---

[2] GENSAT is required by the National Institute of Health ("NIH") to provide this service to all scientists in the U.S. GENSAT is a Rockefeller University project that is in the process of creating a genetic atlas of the mammalian brain that provides unprecedented access to central nervous system regions, cell classes and pathways. The project is spear-headed by Dr. Nathanial Heinz, a noted scientist who has validated Dr. Emamian's work by citing it in one of his own articles. Dr. Heinz also wrote a "perspective" article in *Science* about Dr. Emamian's discovery; *Science* only publishes "perspectives" that concern highly influential discoveries.

final injection. (Dr. Emamian was responsible for creating the DNA that was to be injected, by GENSAT, into the mice in order to create mutant mice.)

26.     In December of 2004, after Dr. Emamian had prepared her DNA, and was ready for the next GENSET step, she was called into Dr. Greengard's office. He told her to stop her work immediately because GENSAT would no longer be able to handle the project. A few weeks later, however, Dr. Nathanial Heinz, Professor and Head of the Laboratory of Molecular Biology, announced that GENSAT was running out of interesting genes and requested that scientists throughout the university come up with new genes. Based on this request, Dr. Emamian believed that her prior research was still of importance to the project. Accordingly, she appealed to Dr. Paul Nurse, Mr. Fred Bohen and Ms. Virginia Huffman on multiple occasions to allow her to re-start her research. They did not respond to Plaintiff's requests. As a result, Dr. Emamian has essentially lost the opportunity to pursue this research, since a Duke University scientist, Dr. Marc G. Caron, performed experiments similar to hers and has now published a paper on the subject.

27.     Upon information and belief, Dr. Emamian is the only scientist or researcher who has been told to stop her GENSAT project.

**Dr. Greengard refuses to support Dr. Emamian in her research and publication of her discovery.**

28.     In or about the summer of 2004, Dr. Emamian made an important discovery regarding interaction of PKAc with AKT – two critical molecules that regulate

several important functions within the cells in the human body -- and, subsequently, the discovery of the AKT inhibitor peptide. This discovery has potential applications for cancer therapy, because AKT activity has a crucial role in the development of cancer. The AKT inhibitor, the compound that Dr. Emamian discovered, has the potential to inhibit tumor growth and treat cancer.

29.    Rockefeller has patented Dr. Emamian's discovery.

30.    Dr. Greengard's discriminatory treatment of Dr. Emamian appeared to impact the manner in which Dr. Emamian's colleagues treated her. For example, in or about April 2005, Marc Flajolet, another lab member sent Dr. Emamian an e-mail that was copied to the entire lab, in which he called her a "camel driver."

31.    On or about May 9, 2005, Dr. Emamian presented her data and findings in a lab meeting. When she showed a slide of human tissue that was taken during her prior research (prior to being told to stop research on human tissue) Dr. Greengard berated her in front of her peers, and stopped her presentation. Dr. Emamian complained about this behavior to her fellow colleagues.

32.    On or about May 10, 2005, Dr. Greengard called Dr. Emamian into his office and berated her further. He told her not to talk and not to cry or he would become extremely angry. He shouted at her and said: "I don't like you, I don't want you to stay here and you have to find another job." He had his dog in his office and it began to snarl at Dr. Emamian as Dr. Greengard raised his voice. Dr. Emamian left the room immediately. Directly after her meeting with Dr. Greengard, Plaintiff immediately went to the office of Dr. Ali Brivanlou to report what happened. Dr. Brivanlou initially offered

to help Dr. Emamian, but then later told her that he did not feel secure enough in his position at Rockefeller to help her.

33.    In early May 2005, Dr. Emamian completed a draft of the disclosure form regarding her recent discovery of the interaction of AKT inhibitor peptide. The University required that all scientists promptly disclose any discovery to the Office of Technology Transfer ("OTT"). Dr. Emamian submitted a copy of the disclosure form to Dr. Greengard, for his input, pursuant to University policy. The OTT requested that Dr. Emamian show them the underlying data of the experiment, Dr. Greengard refused to endorse Dr. Emamian's research, however, and refused to let her submit her data to the OTT. Dr. Greengard informed her that he had discussed her findings with "experts" and that they did not find her discovery to be of importance. Dr. Greengard e-mailed her stating that he believed the disclosure was far too preliminary, that he was "unhappy with the efficiency of [her] performance, with [her] scientific judgment, and with [her] personality." Dr. Emamian followed Dr. Greengard's orders and did not submit her data to the OTT for several months.[3]

34.    In July 2005, Dr. Emamian e-mailed Dr. Greengard a draft of her paper on July 8, 2008 and requested a meeting to review the data that she presented in the paper. In response, on July 11, 2005, Dr. Greengard e-mailed her stating: "I do not wish to be involved with this paper, I give you permission to submit it without my name." Dr, Greengard fully understood that without his name – as her mentor and head of the lab – that she faced a nearly impossible task of getting the paper published or recognized. The same day, Dr. Emamian appealed to Dr. Greengard to give her a chance and to explain

---

[3] Dr. Emamian eventually submitted her work in August of 2005 to the OTT on the suggestion of Dr. Paul Nurse and Ms. Huffman. Rockefeller now holds the patent on this discovery.

his concerns regarding the paper. On July 13, 2005, Dr. Greengard e-mailed Dr. Emamian that he didn't think she had done enough experiments and that he found her difficult to work with, and stated that, "[y]ou should consider yourself very fortunate that despite my opinion of the quality of your work, I am permitting you to publish... I no longer have confidence in the quality of your work." He also added that he hoped "that you will find your new institution in the very near future. I do not wish to continue this correspondence with you any more."

**Dr. Emamian complains about the discriminatory treatment**

35.    On or about of July 2, 2005, Dr. Paul Nurse, President of Rockefeller, responded to an email that Dr. Emamian had sent earlier requesting input on a scientific essay. Dr. Emamian replied to his email stating that she needed to speak with him urgently about a sensitive situation. Dr. Nurse did not reply to Dr. Emamian for 40 days.

36.    Finally, on August 11, 2005, after multiple e-mails and phone calls to Nurse's secretary, Josephine Poniente, Ms. Poniente referred Dr. Emamian to Ms. Virginia Huffman, the Vice President of Human Resources.

37.    Dr. Emamian immediately contacted Ms. Huffman. Dr. Emamian met with Ms. Huffman on August 17, 2005. The meeting lasted approximately 2 to 3 hours. During the meeting, Ms. Huffman urged Dr. Emamian not to use the word "discrimination," because that word had "legal consequences." She stated that if Dr.

Emamian insisted on using that word, it might be difficult to resolve her situation peacefully.

38.    Shortly after Ms. Huffman began her investigation, Dr. Emamian found that Ms. Huffman was non-responsive to her attempts to contact her and did not appear to be engaging in good faith efforts to investigate her complaints. On September 30, 2005, Dr. Emamian requested that Ms. Huffman stop her investigation and requested that someone else handle her complaints.

39.    On or about early October 2005, Mr. Fredrick M. Bohen, Executive Vice President of Rockefeller University sent Dr. Emamian a letter stating that "Dr. Nurse has asked me to contact you regarding your allegations of discrimination." In this letter, Mr. Bohen requested a detailed written statement of her allegations. On or about October 7, 2005, Dr. Emamian sent Mr. Bohen a letter detailing her allegations of both discrimination and unfair treatment by Dr. Greengard and others under his tutelage in the lab.

40.    On October 28, 2005, Dr. Emamian met with Dr. David Nathan to discuss her complaints. She tried to explain to Dr. Nathan how Dr. Greengard's actions were discriminatory. Dr. Nathan repeatedly responded that Dr. Greengard's actions were not discriminatory, but rather the result of a "lack of chemistry."

41.    Dr. Greengard clearly treated men in his lab better than women, picking favorites among the men and giving them special privileges; his treatment of foreign women was particularly discriminatory. Dr. Greengard refused to provide Dr. Emamian with details regarding the claimed inadequacies in her research, his

11

inexplicable cessation of her experiments and his reasons for yelling at her during her lab presentation in front of her peers and colleagues.

42.    On November 11, 2005, Dr. Emamian applied for a tenure track faculty position at Rockefeller.

43.    On November 29, 2005 Rockefeller selected Dr. Emamian as their candidate for the Staglin NARSAD Schizophrenia Research Award, commending her "outstanding work in several areas of neuroscience."

44.    On December 12, 2005 Dr. Emamian met with Dr. Nathan and Mr. Bohen. Dr. Nathan informed her that the investigation into her allegations had been concluded. Dr. Nathan also said that Dr. Emamian had a difficult personality and that she should work in the biotechnology industry because she was not academically efficient. They told her that Dr. Greengard would no longer be her scientific supervisor and mentor and that she was not permitted to work directly with Dr. Greengard.

45.    Dr. Bohen immediately e-mailed Dr. Emamian after the meeting to inform her that Dr. Michael Young would now be Dr. Emamian's "scientific director and mentor." Dr. Young did not work Dr. Emamian's field. He was also extremely busy and, as a result, could not fully supervise Dr. Emamian's work. Dr. Emamian essentially was forced to work independently without the necessary support and title normally given to an independent researcher.

46.    On December 13, 2005 Dr. Greengard wrote Dr. Emamian a letter of apology stating that his communication with Dr. Emamian, concerning "a lack of common view" about the research she pursued, had been rude. Dr. Greengard added that he had arranged for Dr. Emamian to continue in his laboratory and that his laboratory

would be "providing personnel and material support for the experiments that will strengthen [her] proposed publication." (A copy of Dr. Greengard's letter is attached as Exhibit C).

### Dr. Emamian informs Rockefeller that she intends to file a complaint

47.    On February 21, 2006, Dr. Emamian wrote a letter to Mr. David Rockefeller, Honorary Chairman of the Trustees, Mr. Russell L. Carson, Chairman of the Trustees and Dr. Nurse, informing them that she intended to file a complaint regarding the discriminatory and retaliatory action taken against her.

48.    On March 2, 2006, Rockefeller informed Dr. Emamian that they were "no longer actively pursuing [her] application" for the tenure-track position for which she had applied in November 2005. Rockefeller never called Dr. Emamian for an interview.

49.    Upon information and belief, two male colleagues, who were less qualified than she, were ultimately hired in the position for which Dr. Emamian had applied.

50.    On January 4, 2007, Dr. Greengard sent Dr. Michael Young a letter stating that he did not intend to renew Dr. Emamian's appointment in July of 2007. He stated that Dr. Emamian was unwilling "to accept constructive criticism and act in a collaborative manner", even though Dr. Emamian had consistently requested his comments, input and explanations as to his decisions and he had refused to provide such

feedback. Dr. Greengard added that they had been unable to work together since Spring 2005.

## Rockefeller University does not renew Dr. Emamian's appointment and employment

51.     On January 10, 2007 Rockefeller sent Dr. Emamian a letter stating: "Pursuant to the Policy Governing Appointments and Promotions of Research Assistant Professors and Research Associate Professors adopted as of December 12, 2006 … your appointment as a Research Assistant Professor in the Laboratory of Molecular and Cellular Neuroscience will not be renewed and your employment at the University will end on July 31, 2007." Upon information and belief, Rockefeller decided not to renew Dr. Emamian's appointment because of her status as a Muslim woman and in retaliation for her having complained about the discriminatory treatment she endured during her employment with Rockefeller.

52.     In February 2007 Dr. Emamian was awarded the 2007 Young Investigator Award from the International Congress on Schizophrenia research.

53.     Dr. Emamian has already been seriously detrimentally affected by the actions of Rockefeller outside of the university itself. Several scientists who had previously enthusiastically agreed to work with her on projects no longer respond to her emails. She is no longer invited for job interviews that people less qualified than her have been invited to interview for, and for which some have been hired.

54.    To date, Dr. Emamian has been unable to secure alternative employment. Without alternative employment at another lab, Dr. Emamian will be unable to continue with her studies.

55.    Dr. Emamian has lost the opportunity to do further research on her invention. On the patent application, Dr. Emamian is listed as the "inventor" of her discovery. Upon information and belief, male researchers who are involved in a discovery that Rockefeller deems necessary to patent are provided with the necessary tools, personnel, financial support, space and resources to follow up on their invention, conduct the necessary experiments, and publish the information. Upon information and belief, no male researchers or scientists have been asked to leave immediately after Rockefeller has patented their invention.

56.    As a result of Defendant's discriminatory actions, Dr. Emamian is unable to publish her work. When a researcher's lab supervisor refuses to be associated with the work of his colleague, the scientific community will generally neither publish the work nor accept the findings.

57.    Rockefeller's discriminatory and retaliatory actions have caused Dr. Emamian to suffer significant emotional and physical stress that has required medical care. Among other things, Dr. Emamian has been diagnosed with anxiety disorder and trichotillomania due to mistreatment that she suffered at Rockefeller and her current work environment. She has also been ordered to undergo psychotherapy and been given several medications, including sleeping pills.

15

<u>FIRST CLAIM</u>

(Sex, Religion and National Origin Discrimination Under Title VII)

58.    Dr. Emamian repeats and realleges the allegations contained in paragraphs 1 through 57 as if separately set forth herein.

59.    At all relevant times, Dr. Emamian was an "employee" under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(f).

60.    Rockefeller University is an "employer" under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

61.    Defendant's discriminated against Dr. Emamian because of her sex, race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §2000e-2(a) by the conduct described in this complaint, including subjecting her to Mr. Greengard's discriminatory conduct, failing to adequately address her complaints, and terminating her employment.

62.    As a result of Rockefeller University's discrimination, Dr. Emamian has suffered substantial damages including lost wages and benefits and emotional distress, in an amount to be determined at trial.

63.     Rockfeller University's and Dr. Greengard's discriminatory conduct was engaged in with malice and/or reckless indifference to Dr. Emamian's federally protected rights. Dr. Emamian is therefore entitled to punitive damages under Title VII.

SECOND CLAIM

(Sex, Religion and National Origin Discrimination Under<br>the New York State Human Rights Law)

64.     Dr. Emamian repeats and realleges the allegations contained in paragraphs 1 through 57 as if separately set forth herein.

65.     Defendant discriminated against Dr. Emamian because of her sex, religion and national origin in violation of § 296 of the New York State Human Rights Law by the conduct described in this complaint, including by subjecting her to Dr. Greengard's discriminatory treatment failing to adequately address her complaints, and terminating her employment.

66.     As a result of Defendant's discrimination, Plaintiff has suffered substantial damages, including but not limited to mental distress, lost wages and benefits, in an amount to be determined at trial.

THIRD CLAIM

(Sex, Religion and National Origin Discrimination Under the New York City Human<br>Rights Law)

67.    Dr. Emamian repeats and realleges the allegations contained in paragraphs 1 through 57 as if separately set forth herein.

68.    Dr. Emamian is a "person" under § 8-102(1) of the New York City Human Rights Law.

69.    Rockefeller University is an "employer" subject to the provisions of the New York City Human Rights Law under §8-102(5)) of the Administrative Code.

70.    Defendant's discriminated against Dr. Emamian because of her sex, race and national origin in violation of § 8-107 of the New York City Human Rights Law, by the conduct described in this complaint including by subjecting her to Dr. Greengard's discriminatory treatment failing to adequately address her complaints, and terminating her employment.

71.    As a result of Rockefeller University's and Dr. Greengard's discriminatory conduct, Dr. Emamian has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

72.    On information and belief, Rockefeller University's discriminatory conduct was taken with reckless indifference to Dr. Emamian's rights, entitling Dr. Emamian to punitive damages under the New York City Human Rights Law.

## FOURTH CLAIM

### (Retaliation Under Title VII)

73.     Dr. Emamian repeats and realleges the allegations contained in paragraphs 1 through 57 as if separately set forth herein.

74.     Dr. Emamian opposed Rockefeller's unlawful, discriminatory employment practices and engaged in protected activity under Title VII by (1) asserting that she was being discriminated against in oral and written complaints she made to Rockefeller's agents, including Dr.s Greengard, Nathan and Nurse, Mr. Bohen and Ms. Huffman; and (2) by filing a charge of discrimination with the EEOC on March 2, 2006.

75.     Rockefeller retaliated against Dr. Emamian for having engaged in the protected activity described in the proceeding paragraph by (a) subjecting her to Dr. Greengard's discriminatory treatment, (b) refusing to consider her for a tenure track faculty position and (c) terminating her appointment.

76.     Rockefeller's action constitute discrimination and retaliation against Dr. Emamian in violation of Title VII § 2000e-3.

77.     As a result of Rockefeller's retaliation, Dr. Emamian has suffered substantial damages including lost wages and benefits and emotional distress, in an amount to be determined at trial.

78.    Upon information and belief, Rockefeller's retaliation was engaged in with malice and/or reckless indifference to Dr. Emamian's federally protected rights. Dr. Emamian is therefore entitled to punitive damages under Title VII.

FIFTH CLAIM

(Retaliation Under the New York State Human Rights Law)

79.    Dr. Emamain repeats and realleges the allegations contained in paragraphs 1 through 57 as if separately set forth herein.

80.    Dr. Emamian opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under the New York State Human Rights Law by (1) asserting that she was being discriminated against in oral and written complaints she made to Defendants' agents, including Dr.'s Greengard, Nurse and Nathan, Mr. Bohen and Ms. Huffman; and (2) by filing a charge of discrimination with the EEOC on March 2, 2006.

81.    Defendant retaliated against Dr. Emamian for having engaged in the protected activity described in the preceding paragraph by (a) subjecting her to Dr. Greengard's discriminatory treatment, (b) refusing to consider her for a tenure track faculty position and (c) terminating her appointment.

82.    Defendant's actions constitute discrimination and retaliation against Plaintiff in violation of the New York State Human Rights Law, § 296.

83.    As a result of Defendant's retaliation, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

## SIXTH CLAIM

(Retaliation Under the New York City Human Rights Law)

84.    Dr. Emamian repeats and realleges the allegations contained in paragraphs 1 through 57 as if separately set forth herein.

85.    Dr. Emamian opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under the New York City Human Rights Law by (1) asserting that she was being discriminated against in oral and written complaints she made to Defendants' agents, including Dr.'s Greengard, Nurse and Nathan, Mr. Bohen and Ms. Huffman; and (2) by filing a charge of discrimination with the EEOC on March 2, 2006.

86.    Rockefeller University's termination of her employment after Dr. Emamain complained about being discriminated against based on her sex, religion and national origin, constitutes retaliation in violation of New York City Human Rights Law §8-107(7).

87.    Defendant retaliated against Dr. Emamian for having engaged in the protected activity described in the preceding paragraph by (a) subjecting her to Dr. Greengard's discriminatory treatment, (b) refusing to consider her for a tenure track faculty position and (c) terminating her appointment.

88.    Defendant's actions constitute discrimination and retaliation against Plaintiff in violation of New York City Human Rights Law § 8-107.

89.    As a result of Defendant's retaliation, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

90.    Upon information and belief, Rockefeller University's retaliatory actions were taken with reckless indifference to Dr. Emamian's rights, entitling her to punitive damages under the New York City Human Rights Law.

SEVENTH CLAIM

(Defamation by Implication).

91.    Dr. Emamian repeats and realleges the allegations contained in paragraphs 1 through 57 as if separately set forth herein.

92.    Prior to joining Rockefeller University and Dr. Greengard's laboratory, Dr. Emamian was a well respected and widely cited scientist with many opportunities for employment and collaboration with other scientists.

93.    After complaining of discrimination and retaliation to Rockefeller University, Dr. Emamian has been shunned by the scientific community, she has been unable – despite her best efforts – to find another work opportunity of similar caliber and

scientists who in the past had seemed eager to work with her no longer return her correspondence.

94.     The statements constitute defamation per se in that they are injurious to Plaintiff in her trade, business and profession.

95.     The statements also reflect a malicious and reckless disregard for the rights of Plaintiff, justifying an award of punitive damages against Defendants.


## EIGHT CLAIM

(Tortious Interference with Prospective Economic Advantage)

96.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 57.

97.     Out of spite, malice or ill will and/or through the use of wrongful means, Defendants have prevented Dr. Emamian from finding alternative employment despite her best efforts and have prevented her from collaborating with other scientists despite their initial enthusiasm.

98.     As a direct result of Defendants' interference with Dr. Emamian's prospective employment, Dr. Emamian will be out of work starting on July 31, 2007 and unable to continue her groundbreaking research in schizophrenia.

99.     By reason of the foregoing, defendants are liable to Plaintiff for compensatory damages in an amount to be determined at trial, plus punitive damages.

## NINTH CLAIM

(Race Discrimination under 42. U.S.C. § 1981)

100.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 57.

101.    Defendant's discriminated against Dr. Emamian because of her race in violation of 42. U.S.C. § 1981 (the Civil Rights Act of 1866), by the conduct described in this complaint including by subjecting her to Dr. Greengard's discriminatory treatment failing to adequately address her complaints, and terminating her employment.

102.    As a result of Rockefeller University's and Dr. Greengard's discriminatory conduct, Dr. Emamian has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Rockefeller University as follows:

A.    On the First Claim, back pay, front pay or reinstatement, and benefits plus compensatory and punitive damages, attorneys' fees and costs, all in amounts to be determined at trial;

B.    On the Second Claim, back pay, front pay or reinstatement, and benefits, plus  compensatory damages, costs and interest, liquidated damages, attorneys' fees, costs and interest, all in amounts to be determined at trial;

C.    On the Third Claim, back pay, front pay or reinstatement, and benefits plus compensatory and punitive damages, attorneys' fees and costs, all in amounts to be determined at trial;

D.    On the Fourth Claim, back pay, front pay or reinstatement, and benefits plus compensatory and punitive damages, attorneys' fees and costs, all in amounts to be determined at trial;

E.    On the Fifth Claim, back pay, front pay or reinstatement, and benefits plus compensatory damages, attorneys' fees and costs, all in amounts to be determined at trial;

F.    On the Sixth Claim, back pay, front pay or reinstatement, and benefits plus compensatory damages, attorneys' fees and costs, all in amounts to be determined at trial;

G.    On the Seventh Claim of Defamation, compensatory damages, interests and costs, in amounts as yet undetermined;

H.    On the Eight Claim of Tortious Interference with Prospective Economic Advantage, compensatory damages, interests and costs, in amounts as yet undetermined;

I.    On the Ninth Claim, compensatory damages, interests and costs, in amounts as yet undetermined;

J.    Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

Dated:    New York, New York
          June 7, 2007

LIDDLE & ROBINSON, L.L.P.

By: _____
    Jeffery L. Liddle (JL 8256)
    James A. Batson (JB 2716)
    *Attorneys for Plaintiff*
    800 Third Avenue
    New York, New York 10022
    (212) 687-8500

Ex. A

To: Sean Oliveira, Investigator
U.S. Equal Employment Opportunity Commission
New York District Office Staff

I received my M.D. in 1997 and I completed several very successful years of postdoctoral training at the University of Minnesota (1998-2001) and the Rockefeller University (2001-2004).

I was promoted to a junior faculty position (Research Assistant Professor) as a result of my scientific achievements, and currently hold a position in the laboratory of Dr. Paul Greengard (Nobel Laureate in Medicine, 2000). My scientific contributions are well acknowledged by several scientists worldwide who have written many articles on my published work and have acknowledged the impact of my discoveries in the treatment of human diseases.

Overall, I have felt that my treatment by Dr. Greengard has been unfair and discriminatory since I started working for him in 2004. In particular, I have felt for a long time that Dr. Greengard does not value my work, specifically because I am a Muslim woman and because I am not American. He obviously supports male members of the laboratory much more than me, even though I have a higher academic position, a superior degree, better training experience and more scientific achievements than the male members of the lab.

For example, Dr. Flajolet, who is male, has several postdoctoral and graduate students to mentor. I don't have even one. Dr. Flajolet has two technicians while I have one who is partly paid by my own grant. Dr. Greengard gives Dr. Flajolet the opportunity to serve as a PI on his large NIH grants but never gave me the opportunity to help him with his grants. Dr. Flajolet gets paid more than I do, and also got the office space that I requested – though I am more senior. Other male members in lower academic position in the lab, such as Dr. Yong Kim, have also postdoctorals and technicians and office space while I do not.

I first made the President formally aware of my difficult situation in July of 2005. My case was poorly handled by Mrs. Virginia Huffman, the Vice President of Human Resources who clearly was not interested in investigating or resolving the issue. The whole process was very humiliating, and I specifically requested that Ms. Huffman stop working on my complaint on September 30, 2005.

In response to my concerns, the matter was assigned to Executive Vice President, Mr. Fredrick Bohen, who asked me to provide a written statement of my concerns with respect to the discrimination only. I did so first on Oct 7, 2005, and I followed up with further explanation of my concerns on Nov 14, 2005. In my letters I pointed out serious issues of discrimination and also noted several workplace violations such as improper use of the grant money, research misconduct, and conflicts regarding the use of my research results. I should emphasize that after being abused, suppressed and discriminated against for over a year by Dr. Greengard, he threatened to fire me immediately after I made an important discovery (a compound that has therapeutic applications in cancer). He sent me several harassing emails asking me to leave as soon as possible and was not giving me time to find my next job.

The University's final response to my serious situation and complaints was a vague and useless apology letter from Dr. Greengard, which merely allowed me to keep my job. Even worse, the final conclusion of the investigation process was that because of scientific inefficiencies in my work I should choose a career in industry!  Considering my academic achievements as a junior investigator, this conclusion was unfair and insulting.  I objected on Dec 12, 2005, and since then I have heard nothing form RU. In addition, I have been retaliated against ever since my complaint.

Besides the difficult work environment, it is evident that Dr. Greengard is interfering with my ability to find an alternative job.  For example, I applied for an assistant professor position at Rockefeller University and I was not even invited for interview. This is while, in terms of academic achievements and work experience, I was ranked higher or at least equivalent to all other eleven candidates who were invited for interviews. Other academic institutions have written to me that despite the fact that they are impressed by my scientific achievements, they prefer not to consider my job application!

Dr. Greengard also interferes with my efforts to publish papers, in which I am reporting a very important discovery that has therapeutic applications.

In summary, I have been discriminated against, harassed and retaliated against by Dr. Greengard. Unfortunately, because of his political influence and power, the University actively supports and protects him. At this point I have no other choice but to try to get help from the EEOC.

Please note that this is a very brief summary of the discriminatory and retaliatory acts of Dr. Paul Greengard and the University officials towards me, and my case is not limited to the issues mentioned above. I have gone through so much pain and suffering and suppression that cannot be explained in a brief letter.

Sincerely,

Effat Emamian, MD

Research Assistant Professor
Rockefeller University
New York, NY 10021

Ex. B

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  **Effat Emamian**<br>400 East 70 Street<br>Apt. 1205<br>New York, NY 10021 | From:  New York District Office - 520<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |

☐  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2006-00841 | Sean J. Oliveira,<br>Investigator | (212) 336-3760 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in a federal or state court **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☒  More than 180 days have passed since the filing of this charge.

☐  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐  The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_____          2/16/07

**Spencer H. Lewis, Jr.,**
**Director**

Enclosures(s)

*(Date Mailed)*

cc:     ROCKEFELLER UNIVERSITY
1230 York Avenue, Box 296
New York, NY 10021

Patrick J. Boyd, Esq.
230 Park avenue, Suite 1000
New York, NY 10169

Bettina B. Plevan, Esq.

Proskauer & Rose
1585 Broadway
New York, NY 10036

Ex. C



**THE ROCKEFELLER UNIVERSITY**
1230 YORK AVENUE · NEW YORK, NEW YORK · 10021-6399
Email: greengd@rockefeller.edu; Tel: 212-327-8780; Fax: 212-327-7746

December 13, 2005

Effat Emamian, M.D.
Laboratory of Molecular and Cellular Neuroscience
The Rockefeller University
1230 York Avenue, Box 296
New York, NY 10021

Dear Effat,

    I was pleased to have you join my laboratory in March 2004. I looked forward to directing your research and to giving you the opportunity to advance your knowledge in my laboratory. Over time, we have not shared a common view about the research you pursued. My communications with you about these differences have been rude and, I understand, upsetting to you and for that I apologize.

    I encourage you to focus on your research so that you realize your expectations for your work at The Rockefeller University. I have arranged for you to continue in my laboratory, providing personnel and material support for the experiments that will strengthen your proposed publication. That personnel and material support is committed to you to foster and enhance your research.

    I hope that everyone who has studied and worked in my laboratory will go on to success in his or her career as a scientist. I hope no less for you and will do nothing to stand in your way.

    With good wishes for your progress and for your future.

Yours sincerely,

Paul Greengard
Vincent Astor Professor
Laboratory of Molecular
   and Cellular Neuroscience