UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
Effat S. Emamian,

                    Plaintiff,

          v.                                    07 Civ. 3919 (DAB)
                                                OPINION

Rockefeller University,

                    Defendant.
-------------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Defendant has moved for Judgment as a Matter of Law

pursuant to Rule 50(b) of the Federal Rules of Civil Procedure,

or in the alternative, for a New Trial pursuant to Rule 60 of

the Federal Rules of Civil Procedure, or Remittitur of

Plaintiff's Damages Award.

     For the reasons stated below, Defendant's Motion for

Judgment as a Matter of Law attacking the sufficiency of

Plaintiff's evidence presented at trial is DENIED in its

entirety.

     Defendant's Motion for a New Trial is DENIED on the

following grounds: (i) that it was improper for the jury to be

permitted to return to the jury room and correct their initial

verdict form; (ii) that the jury was incorrectly instructed on

the legal standard for discrimination; (iii) that the jury was

incorrectly instructed on the use of deposition and expert

testimony; (iv) that various parts of the Verdict Form and its

contents were misleading; and (v) that Dr. Emamian was not

entitled to any Back Pay damages because she was on a fixed-term contract. Plaintiff's back pay award of $250,000.00 is upheld.

(vi) The $2,000,000.00 jury damage award for emotional damages was excessive. The Court remits Plaintiff's emotional distress award to $200,000.000. Should Plaintiff not accept that remitted amount, Defendant's Motion for a New Trial is GRANTED on emotional distress damages only.

I. Background

The Court presumes familiarity with the facts and procedural history of this matter but summarizes pertinent facts as follows.

After a seven-week jury trial, a jury unanimously found that Defendant Rockefeller University discriminated against Plaintiff Dr. Effat S. Emamian because of her race/national origin in violation of the New York City Human Rights Law ("NYCHRL").[1]

Dr. Emamian, an Iranian-born neuroscientist, was hired by Dr. Paul Greengard in 2004 to work in his lab at Rockefeller University. Testifying for seven days at trial, she alleged she was treated less well than her white male and female colleagues. She testified that she was paid less than her colleagues of

_____

[1] During trial, the Parties stipulated that only discrimination claims under the NYCHRL would go forward. (See dkts. 168-169.)

2

equal or even lower stature, and was not given equal support on grants, research projects, or use of technology and lab space, among other forms of unfair treatment. (See, e.g., Tr. 303, 365, 385.) She claimed that, among other things, Dr. Greengard embarrassed her in front of her colleagues, asked her to leave after one year into her three-year tenure, and refused to give adequate letters of recommendation for future positions. (Tr. 268-271.) The University allowed her to serve out the remainder of her three-year term, through 2007. (Pl.'s Ex. 44.) Though the University could renew her appointment for another three-year term at its discretion, it did not do so. (Id.; see also Def.'s Ex. U13 at 5-6.) Dr. Emamian testified that many of her colleagues did have their contracts renewed or were promoted.

Dr. Emamian claimed that the University and Dr. Greengard treated her differently because of her race, national origin, religion, and gender. In support of this contention, she testified that Dr. Greengard had once given her a "very, very difficult time" by continuing to ask her questions about her headscarf with a "sarcastic" and "negative" attitude. (Tr. 152-154.) Despite her attempts to change the subject, Dr. Emamian testified that Dr. Greengard persisted by "questioning" whom she wore headscarf in front of, whether she wore it at home, and other questions that "took a very long time." (Tr. 153.)

Plaintiff also presented an email entitled "To the 'cart drivers' (and camel drivers and horse drivers too)." (Tr. 243; Pl.'s Ex. 63.) The email was sent by a colleague of hers, Dr. Marc Flajolet, who hailed from France.[2] The email included a set of pictures, one of which was of a camel, and was sent to the entire laboratory (including Dr. Greengard). It asked lab members to be mindful when pushing carts around the lab. (Id.)

Plaintiff claimed the email was "definitely directed to me." (Tr. 247.) As she explained, "I had to work real [sic] really, really hard to gather some data and I didn't really have enough technicians and enough postdocs or anyone else that could help me. So I really ha[d] to do the job of a technician, which means grabbing the cart, pushing the cart, going to the animal facility, taking the animals and bringing the animals back so I could do the experiments on them. So I was basically pushing the cart over and over and at some point I realized that Dr. Flajolet was making fun of me and I'm pushing the cart around the lab." (Id.) She continued, "On the morning on the same day, on the same day that he sent that e-mail, . . . and he saw me and again he made that face, that laugh, that sarcastic laugh, and I noticed that. I tried to ignore and I went – so this was

---

[2] Dr. Flajolet was still employed by Dr. Greengard as of the date of trial.

4

basically sending this e-mail to everyone putting the driver in quotation marks . . . ." (Tr. 247-248.)

Dr. Emamian said the email made her feel "very, very, very humiliated and – it says what it says. It is very clear. Especially the camel driver is a racial slur. But the cart driver was the part that basically – I know the camel driver, who is called the camel driver, especially by French people." (Tr. 250.) When asked by the Court how she knew that the term "camel driver" was used by French people, she replied, "We have a lot of friends actually living in France. And it is used in European countries. It's not specific to French people, but [the] French are the one who are using it to insult Middle Easterners. . . . Every Iranian [knows] that. It is just [something] that – everyone knows. It is a very, very dirty slur, racial slur against Middle Eastern[ers]. It has a specific meaning." (Id.)[3]

Beginning in 2005, Dr. Emamian testified that she suffered from anxiety and insomnia and started to pull her hair several times a day from her head, legs, and face. (Tr. 389-390.) She began receiving mental health treatment in September of 2005 after her primary care physician diagnosed her with generalized

---

[3] The pejorative connotation of the term was denied by Defendant's Witness, Dr. Ali Brivanlou, another Iranian scientist at Rockefeller University. (See Tr. 1787-1788.)

5

anxiety disorder and trichotillomania.[4] (Tr. 391–392.) She testified that the experience made her want to "die," that she continues to feel "anxious," and continues to have difficulty sleeping, which she had never suffered prior to joining Dr. Greengard's lab. (See, e.g., Tr. 392, 447.) Since her three-year contract expired in 2007, she has not found another job. (Tr. 410, 478, 504–505.) Dr. Emamian also testified that she suffered from significant physical injuries such as hair loss, loss of appetite, severe weight gain due to the use of medications for her anxiety, depression, and insomnia, and also developed a sleep-medication addiction. (See, e.g., Tr. 392, 504.)

Plaintiff's psychiatric expert, Robert Goldstein, M.D., linked Dr. Emamian's prior diagnoses of generalized anxiety disorder and trichotillomania to "the overwhelming stress that she experienced at work, at her job at Rockefeller, as a result of her perceptions that she was being discriminated against and retaliated against, was what triggered her psychiatric condition." (Tr. 1297.) He also noted that, prior to her issues

---

[4] At trial, Dr. Emamian's psychiatric expert, Dr. Robert Goldstein, defined trichotillomania as "a condition characterized by the patient having the need to recurrently pull out their hair so that there is a noticeable loss of hair[, . . .] done as a kind of reaction to anxiety and stress. The patient feels a sense of growing tension until they actually pull out the hair. And then when they do pull out the hair, they feel a sense of relief." (Tr. 1279.)

with Rockefeller, she "had no prior psychiatric problems of any kind." (Id.)[5]

After a seven-week trial, with approximately 200 exhibits and 20 witnesses, the jury returned a verdict for the Plaintiff on her intentional discrimination claim. The jury found that the "University treated her less well, [at] least in part, because of her race/national origin." (Droubi Decl. Ex. 1, dkt. 236 at 1, ("Special Verdict Form 1").) Initially, however, while the jury had found that the Plaintiff had proved by a preponderance of the evidence the University treated her less well because of her race/national origin, the jury had checked "No" when asked if the Plaintiff had proved "by a preponderance of the evidence that the defendant intentionally discriminated against her at least in part because of her race/national origin, and/or gender, and/or religion." (Id. at 2.) Nevertheless, on the initial jury form, the jury had awarded damages of $250,000.00 in back pay up to July 31, 2010 and $2,000,000.00 in Physical, Mental, and/or Emotional Damages (id. at 4), even though the jury had been instructed not to award any damages if it had not found any intentional discrimination. (Id. at 2.) The Deputy Clerk, Ms. Khalilah Williams, read the verdict form in open court, following the instructions on the verdict form. The Court

_____

[5] Defendant disputed the cause of her diagnoses and suggested she suffered from a personality disorder.

had not reviewed the verdict form prior to it being read in open court. (Tr. 3351-3355). The jury was polled after the initial verdict was read, and the jury was discharged. (Id.) Plaintiff's counsel soon asked for a sidebar, and the Court instructed the jury to remain in their seats in the Courtroom. During the sidebar, the foreperson told the Deputy Clerk that she had not read all of what they said. The Court interrupted the sidebar and asked the jury if they needed "to go back into the jury room and straighten something out." (Tr. 3356.) Two jurors responded in the affirmative, and indicated they needed another verdict form. The Court then sent the jury back into the deliberation room.

While the jury was deliberating a second time, the Court stated to counsel:

> THE COURT: What has transpired is after the verdict was read, and I discharged them, they called Ms. Williams over, and said you didn't read some of what we said. What they said was they had filled in dollar numbers, even though they had said no to everything except race -- I'm sorry. Except the race and national origin. So they realized the mistake, they asked for another form, we gave them another form, they filled out another form, and now we're going to have act two of the verdict. (Id.)

The jury came back from deliberations after 15 minutes and the Court stated to them: "I understand that there was an error made by you in filling out the first verdict form. You caught it. You asked to have an opportunity to correct it. You were given that

8

opportunity." (Tr. 3356-3357.) The Court also stated, "By the way, I think I'd actually discharged you before this mistake was known. You're no longer discharged. You are still jurors." (Tr. 3357.)

The Deputy Clerk read the second verdict form, in which the jury checked "Yes" to both parts of Question 1 on intentional discrimination. (Ex. 2 to Droubi Decl., dkt. 236 at 1-2, ("Special Verdict Form 2").) The Jury again awarded damages of $250,000.00 in back pay up to July 31, 2010 and $2,000,000.00 in Physical, Mental, and/or Emotional damages. (Id. at 4.) The Deputy Clerk polled the jury, and the Court then discharged the jury "for real." (Tr. 3359-3360.) After the jury left, Defense Counsel asked the Court permission to file post-trial motions. The Court stated:

> You can raise whatever issue you choose. It is my opinion that, while most unusual, the fact that they had filled in numbers, amounts, on the first verdict form, had I looked at, which I do not do, I might have caught the issue then. Fortunately, the foreperson, Ms. Kolaitis, realized that there was something amiss when the amounts were not read, and talked to Ms. Williams.
>
> I also think the fact that they found against the plaintiff for retaliation and also for promissory estoppel suggests that they really did go through the evidence and make independent judgments, as I told them they had to on each of the counts.

(Tr. 3361.)

Before the Court now is Defendant's March 28, 2018 Motion for Judgment as a Matter of Law,[6] or in the Alternative, a New Trial or Remittitur of the Damages Award. (Dkt. 234 ("Def.'s Mot.").) Plaintiff's opposed on April 25, 2018 (Dkt. 235 ("Pl.'s Opp'n")), and Defendant replied on May 2, 2018. (Dkt. 237 ("Def.'s Reply").)

## II. Judgment as a Matter of Law

Defendant first claims that because Plaintiff did not prove her race/national origin discrimination claims by a preponderance of the evidence, it is entitled to judgment as a matter of law pursuant to Rule 50(b). Because Defendant has not shown that there was "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," Cruz v. Local Union No. 3 of IBEW, 34 F.3d 1148, 1154 (2d Cir. 1994) (citation omitted), its Rule 50(b) Motion is DENIED.

### A. Rule 50(b) Legal Standard

In considering a motion for judgment as a matter of law, the district court "must draw all reasonable inferences in favor

---

[6] Defendant initially made a Rule 50(a) Motion on all claims after Plaintiff rested her case. The Court denied that Motion for all claims (except for Negligence) on February 21, 2018. (Dkt. 175.) Defendant now brings a renewed Motion for Judgment as a Matter of Law pursuant to Rule 50(b).

10

of the nonmoving party, and it may not make credibility
determinations or weigh the evidence. . . . [A]lthough the court
should review the record as a whole, it must disregard all
evidence favorable to the moving party that the jury is not
required to believe." Reeves v. Sanderson Plumbing Prods., 530
U.S. 133, 150-51 (2000).

"Thus, a court may grant a motion for judgment as a matter
of law only if it can conclude that, with credibility
assessments made against the moving party and all inferences
drawn against the moving party, a reasonable juror would have
been compelled to accept the view of the moving party." Zellner
v. Summerlin, 494 F.3d 344, 370-71 (2d Cir. 2007) (emphasis in
original) (internal quotation marks omitted). In deciding a Rule
50 motion, the Court "cannot assess the weight of conflicting
evidence, pass on the credibility of the witnesses, or
substitute its judgment for that of the jury." Black v. Finantra
Capital, Inc., 418 F.3d 203, 209 (2d Cir. 2005) (citations
omitted). A jury is "entitled to believe some parts and
disbelieve other parts of the testimony of any given witness,"
Tolbert v. Queens Coll., 242 F.3d 58, 74 (2d Cir. 2001), and
"need not accept a given witness's testimony even if it is
uncontradicted." Book v. Dettenrieder, 14 F. App'x 40, 43 (2d
Cir. 2001).

A post-trial motion for judgment as a matter of law under Rule 50(b) "is limited to those grounds that were specifically raised in [a] prior [Rule 50(a) motion]; the movant is not permitted to add new grounds after trial." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 286 (2d Cir. 1998) (internal quotation marks omitted). "Although Rule 50(a) does not define how specific the motion must be, the purpose of requiring the moving party to articulate the ground on which [judgment as a matter of law] is sought is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." Id. at 287 (internal citations and quotation marks omitted). Therefore, "[t]he ultimate question is whether the [Rule 50(a)] motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof. If specificity was lacking," the Rule 50(b) motion may not be granted "unless that result is required to prevent manifest injustice." Id.; see also Malmsteen v. Berdon, LLP, 595 F. Supp. 2d 299, 303 (S.D.N.Y. 2009) (citing same standard).

B. Analysis

In its Rule 50(b) Motion, Defendant attacks the sufficiency of Plaintiff's evidence on two main grounds: that Dr. Flajolet's

"camel driver" email was insufficient to establish discrimination, and that Plaintiff's own admissions established that no discrimination occurred. (Def.'s Mot. at 5.)

Defendant faces an uphill battle, because it essentially asks this Court to "assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury," which this Court must not do. Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988) (internal citation omitted); see also Cruz, 34 F.3d at 1154 ("Judgment as a matter of law should be granted when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." (citations omitted) (alterations in original)). The Court will address each argument in turn.

1. Camel Driver Email

Defendant first argues that Dr. Flajolet's April 23, 2005 email with a subject line of "to all the card drivers (and camel drivers . . . and horse drivers . . ." constitutes an "isolated, stray remark," is insufficient to support a discrimination claim. (Def.'s Mot. at 8-9; Pl.'s Ex. 63.)

Defendant claims that a single remark given by Dr. Emamian's co-worker cannot support her claim for discrimination because Dr. Greengard, her only supervisor, had nothing to do with the email. Defendant further argues that Plaintiff did not establish a causal "nexus . . . between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." (Id. at 8.) Defendant cites primarily to Henry v. Wyeth Pharms., Inc., which holds that in determining whether a single remark is probative, district courts may consider:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

616 F.3d 134, 149 (2d Cir. 2010).

Yet the Wyeth case involved violations under Title VII and the NYS Human Rights Law. And as Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102 (2d Cir. 2013), made clear, analysis under the City Human Rights Law is different. While a Plaintiff under the NYCHRL "still bears the burden of showing that the conduct is caused by a discriminatory motive," Mihalik determined that the degree of causal relationship between motive and conduct may not be as stringent under the City standard as it is under the Federal/State standard. See Mihalik, 715 F.3d at

110 (noting that a plaintiff under the NYCHRL need only demonstrate that "she has been treated less well <u>at least in part</u> "because of her gender," where federal standard does not contain the "at least in part" restriction and has a burden-shifting framework); <u>see</u> <u>also</u> <u>id.</u> at 110 n.8 ("While it is unclear whether <u>McDonnell Douglas</u> continues to apply to NYCHRL claims and, if so, to what extent it applies, the question is also less important because the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason.").[7]

The <u>Mihalik</u> Court also instructed District Courts to consider the "totality of the circumstances" when examining a single remark. "[T]he overall context in which [the challenged conduct occurs] cannot be ignored. Even 'a single comment that objectifies women . . . made in circumstances where that comment would, for example, signal views about the role of women in the workplace [may] be actionable.'" <u>Id.</u> at 111 (citing <u>Williams v.</u>

---

[7] While some district courts have extended <u>Wyeth</u> to NYCHRL claims, <u>see</u>, <u>e.g.</u>, <u>Williams v. Victoria's Secret</u>, No. 15CV4715PGGJLC, 2017 WL 384787, at *9 (S.D.N.Y. Jan. 27, 2017), <u>report and recommendation adopted,</u> No. 15-CV-4715 (PGG)(JLC), 2017 WL 1162908 (S.D.N.Y. Mar. 28, 2017), this Court declines to do so as a bright-line rule. It is unclear whether the District Court in <u>Williams</u> even considered the difference in federal and city standards. Moreover, the stray remarks in <u>Williams</u> were just that: stray remarks. It is unclear if the Plaintiff in <u>Williams</u> advanced anything else besides those several remarks in his case.

N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 41 (N.Y. App. Div. 1st Dep't 2009)).

This Court will continue to follow Mihalik and will not disturb the jury's findings when it considered Dr. Flajolet's email. There was other evidence presented to the jury, such as Dr. Greengard's questioning of the Plaintiff about her headscarf. Without passing judgment on the weight of any piece of evidence over another, the Court notes that Dr. Flajolet saw Dr. Emamian pushing a cart before the email was sent (Tr. 247-248), that Plaintiff testified that "camel drivers" was a "very, very dirty slur . . . against Middle Easterners," (Tr. 250),[8] and that Dr. Greengard himself stated, "This e-mail had nothing objectionable in it. . . . And the way I read this it was a very amusing series of do-not-park things, including the camel. . . . It didn't occur to me that it would be offensive. And I'm very sensitive to offensive ethnic slurs." (Tr. 1371-1372). The Court will not speculate as to how the jury viewed the camel driver email in light of the entire record and deem the email a single "stray remark," insufficient to support discrimination as a matter of law.

---

[8] It is possible the Jury believed Dr. Emamian's testimony regarding "camel drivers" over that of Dr. Brivanlou, a fellow Iranian scientist still employed by the University who testified he had never heard of the term.

2. Plaintiff's Own Admissions

Defendant next argues that Plaintiff's own "admissions" regarding her race and national origin repudiate her discrimination claims. (Def.'s Mot. at 6-7.) Defendant claims the "only evidence at trial about Plaintiff's race is the Self-Identification Form that she completed when she started work at the university, in which she voluntarily identifies herself as 'white.' . . . On this basis alone, judgment as a matter of law should be entered on Plaintiff's race discrimination claim." (Id. at 6 (citing Tr. 1069; Def. Ex. G).)

This is hardly an "admission." There was no option to identify as "Middle Easterner" on the University's self-identification form. (Tr. 2512.) And as this Court noted in its Rule 50(a) Motion, the Supreme Court has already ruled that though Middle Easterners may technically be classified as "Caucasian" under modern scientific theory, they may still assert a claim for racial discrimination under discrimination laws. See Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987) ("Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would

be classified as racial in terms of modern scientific theory. .
. . If respondent on remand can prove that he was subjected to
intentional discrimination based on the fact that he was born an
Arab, rather than solely on the place or nation of his origin,
or his religion, he will have made out a case under § 1981.").

        In fact, a closer examination of the Al-Khazraji case
reveals a nearly identical "admission" as the "admission"
presented here. The District Court in that case relied on the
fact that during a deposition, when asked what his race was, the
plaintiff stated that his race was "Caucasian," and that he was
"claiming the national origin [sic] which is closer related to
race and religion." Al-Khazraji v. Saint Francis Coll., No.
CIV.A. 80-1550, 1985 WL 9627, at *2 (W.D. Pa. Mar. 12, 1985).
The District Court dismissed Plaintiff's racial § 1981 in large
part on that ground, finding that Plaintiff could not establish
a racial discrimination claim because he self-identified as
Caucasian. Id. Yet the Third Circuit and the Supreme Court
reversed the District Court's determination, Plaintiff's own
statements notwithstanding. Al-Khazraji, 481 U.S. at 613; Al-
Khazraji v. Saint Francis Coll., 784 F.2d 505, 518 (3d Cir.
1986); see also Nizami v. Hartford Fin. Servs. Grp., Inc., No.
3:10CV970 SRU, 2012 WL 3596482, at *4 (D. Conn. Aug. 20, 2012)
(fact that Middle Eastern woman checked "White" on self-
identification form not determinative in her racial

                              18

discrimination claim). Thus, Plaintiff's choice on her self-identification form does not preclude her racial discrimination claim.

Defendant next cites to Plaintiff's 2005 interview with Dr. Nathan where Plaintiff stated "No, I'm not saying he's discriminating against me based on what . . . I am from Tehran." (Def.'s Mot. at 7 (citing Tr. 1061; Def. Ex. 107A).) Defendant claims this statement should warrant judgment for the University on her national origin claim. (Id.)

Notwithstanding the fact that this was an unsworn interview of Dr. Emamian, the jury could have interpreted (and valued) the statement in a number of ways. Dr. Emamian could have been interrupting her own thought rather than denying all forms of discrimination. Dr. Emamian also testified that the transcript did not accurately reflect what she said (Tr. 1248), and pointed to other instances where she felt Dr. Greengard had, at least partly, discriminated against her on the basis of her Iranian origin. (See, e.g., Tr. 1058.) It is not for this Court to second-guess the jury's evaluation of this single statement and give it any more or less weight than the jury did.

Finally, Defendant argues that during a meeting with Dr. Greengard where Dr. Greengard asked questions about Dr. Emamian's headscarf, Dr. Emamian admitted that his questions were not discriminatory because she stated, "In that meeting, I

didn't feel that he's discriminating against me." (Tr. 154.)
While the Plaintiff did state that on direct examination, her
exact feelings at the time of the conversation are not
dispositive in the greater context of a 3-year NYCHRL
discrimination claim. Mihalik, 715 F.3d at 113 ("[T]the totality
of the circumstances must be considered because the overall
context in which the challenged conduct occurs cannot be
ignored." (internal quotations and alterations omitted)).
Moreover, Plaintiff also testified that Dr. Greengard kept on
giving her a "very, very difficult time" in the meeting by
continuing to ask her questions about her headscarf with a
"sarcastic" and "negative" attitude. (Tr. 152-154.) Despite her
attempts to change the subject, Dr. Emamian testified that Dr.
Greengard persisted by "questioning" whom she wore headscarf in
front of, whether she wore it at home, and other questions that
"took a very long time." (Tr. 153.) While the jury could have
reasonably determined that this was mere curiosity on the part
of Dr. Greengard, it could have also inferred discriminatory
intent. Without wading into the importance the jury may, or may
not, have attached to Dr. Emamian or Dr. Greengard's statements,

the Court finds this insufficient to overturn the jury's finding of intentional discrimination.[9]

## III. New Trial

Defendant also moves in the alternative for a new trial under Rule 59. Defendant makes several arguments: (i) that the jury should not have been permitted to return to the jury room and correct their initial verdict form; (ii) that the jury was incorrectly instructed on the legal standard for discrimination; (iii) that the jury was incorrectly instructed on the use of deposition and expert testimony; (iv) that various parts of the Verdict Form and its contents were misleading; (v) that Dr. Emamian was not entitled to any Back Pay damages because she was on a fixed-term contract; and (vi) that a $2,000,000.00 jury damage award for emotional damages was excessive and should be remitted.

As explained in detail below, Defendant's Motion is DENIED on grounds (i)-(v), but GRANTED in the alternative with respect to ground (vi). The maximum amount of emotional distress damages Plaintiff would reasonably be entitled to is $200,000.00. Should

---

[9] Defendant also argues that it was impossible for Dr. Greengard to discriminate against Dr. Emamian because he extensively supported her after learning of her race and national/origin. (Def.'s Mot. at 11-12.) While this may or may not be true, it appears to be a question of fact that the jury appropriately considered. The jury even requested a second viewing of Dr. Greengard's deposition testimony. Defendant asks the Court to relitigate this question and make a credibility determination, which it declines to do.

Plaintiff not accept that remitted amount, Defendant's Motion for a New Trial is GRANTED as to emotional distress damages only.

  A. Rule 59 Legal Standard

A district court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).

Unlike a Rule 50 motion, the District Court may "weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012) (citing United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998)). However, "trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, . . . and may not 'freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury.'" Id. (internal citations omitted).

Movants face a high bar: "A grant of a new trial on the ground that the verdict was against the weight of the evidence is appropriate if the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." DLC

<u>Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 133 (2d Cir.
1998) (internal quotation marks omitted).

B. Analysis

1. Mistaken Verdict Form

Defendant first argues that it is entitled to a new trial
because the jury's initial verdict should have been accepted.
(Def.'s Mot. at 2-5.)[10] Defendant argues "there was no error or
inconsistency in the jury's initial verdict." (<u>Id.</u> at 2.)
Rather, Defendant implies that the jury intended to answer "no"
to the second part of Question One of the first verdict form,
which was the only question which could actually establish
Defendant's liability. (<u>Id.</u> at 3.) The Defendant ignores that
the jury did answer the first part of Question One on the
initial verdict form, that the Plaintiff had established
intentional discrimination by a preponderance of the evidence on
the basis of race/national origin.

Defendant claims it was improper for the Court to allow the
jury to return to the jury room and correct their verdict after
they notified the Court of a "mistake" in the first verdict
form. Defendant's arguments are without merit. The proceedings
described above fall squarely within the realm of <u>Dietz v.
Bouldin</u>, where the Supreme Court held that "a federal district

---

[10] The Court styles this as a Rule 59(a) Motion.

court has the inherent power to rescind a jury discharge order and recall a jury for further deliberations after identifying an error in the jury's verdict." 136 S. Ct. 1885, 1890 (2016). In that case, the only issue to be decided was damages, and the parties had stipulated before trial that any damages award must be at least $10,136.00, which comprised the Plaintiff's medical bills. Id. The jury returned an initial verdict of $0, and the Court discharged the jury telling them they were free to go. After the jury left the courtroom, the Court realized the mistake and recalled jurors into the Courtroom (one juror had left the courtroom building but soon returned.) Id. The Court instructed the jury that it was legally impossible for the jury to return such a verdict on damages because of the parties' stipulation and ordered the jurors to deliberate again in light of the stipulation. The next day, the reassembled jury returned a verdict of $15,000 for the Plaintiff. Id. at 1891.

The Supreme Court found the District Court's actions to be a "reasonable response to the problems and needs confronting the court's fair administration of justice." Id. at 1892 (citing Degen v. United States, 517 U.S. 820, 823-824 (1996)). Finding no error, the Court held that a "district judge has a limited inherent power to rescind a discharge order and recall a jury in a civil case where the court discovers an error in the jury's verdict." Id. The Court cautioned that this power must still be

exercised with restraint, especially when the possibility of tainting the jury is high. Id. at 1894. District Courts should be mindful of the length of delay between discharge and recall, and the potential for the jury to be influenced after discharge. Id. at 1894-95.

Here, the jurors had not even left the courtroom before they notified the Courtroom Deputy of a mistake. After Ms. Williams had read the initial verdict, the Parties approached the bench for a sidebar. During the sidebar, the jury called over Ms. Williams and told her that the she did not read everything they put on the verdict form. When the sidebar ended, Court asked the foreperson if the jury needed to "straighten something out." The foreperson responded in the affirmative and sought to return to the jury room with another jury form. (Tr. 3355-3356.)

By allowing the jury to return to the jury room to correct an error in their first verdict form, the Court exercised its inherent discretionary power to manage its own affairs "so as to achieve the orderly and expeditious disposition of [its] cases." Dietz, 136 S. Ct. at 1891. No time had elapsed between the first "discharge" of the jury and the jury informing Ms. Williams that they had made a mistake.[11] "It is significant that, although the

---

[11] The record reflects that the jury called Ms. Williams over, not the other way around. Compare (Tr. 3356 ("THE COURT: What has transpired

jury had technically been declared discharged' by the court, it
had not dispersed. The jurors were therefore not exposed to
"'outside factors,' which might render the reliability of any
poll on recall problematic." United States v. Rojas, 617 F.3d
669, 676-77 (2d Cir. 2010);[12] see also Dietz, 136 S. Ct. at 1897
("A discharge order is not a magical invocation."). Thus, the
possibility of tainting the jury was zero. See Rojas, 617 F.3d
at 678 (finding it proper for district court to reconvene jury
to correct a technical error in courtroom deputy's reading of
verdict form because "no further deliberation took place between
the initial discharging of the jury and minutes later when it
was reassembled in the courtroom"). Moreover, the initial poll
of the jury on their incorrect verdict form does not mean that
the Court must accept a mistaken verdict. See id. at 679 ("The
fact that the jury originally assented to the misread version of
its verdict does not alter our holding . . . .").

      This reasoning is in line with other similar cases of the
Second Circuit and this District. See, e.g., Attridge v. Cencorp

---

is after the verdict was read, and I discharged them, they called Ms.
Williams over . . . So they realized the mistake.")); with Dietz, 136
S. Ct. at 1894 ("Even apparently innocuous comments about the case
from someone like a courtroom deputy such as 'job well done' may be
sufficient to taint a discharged juror who might then resist
reconsidering her decision.").

[12] While Rojas was a criminal case involving a deputy clerk who misread
a "correct" verdict form in open court, the same principles on
discharge versus dispersion apply.

Div. of Dover Techs. Int'l, Inc., 836 F.2d 113, 114 (2d Cir. 1987) (allowing district court to reconvene a jury the following day when two jurors informed the courtroom deputy of an error in the verdict's damages calculation); TeeVee Toons, Inc. v. MP3.Com, Inc., 148 F. Supp. 2d 276, 278 (S.D.N.Y. 2001) (after two jurors saw news reports following trial indicating an incorrect damage amount had been awarded, district court allowed jury to reconvene the following day and correct the amount).

Defendant's citations to Munafo are inapposite. In that case, after the special verdict form on facts was read, the Court rendered the verdict and the jury was discharged. Munafo v. Metro. Transp. Auth., 381 F.3d 99, 103 (2d Cir. 2004). Two jurors told a law clerk they were "surprised" by the verdict rendered by the Court on their factual findings. Id. When the judge brought the jury back into the courtroom, the foreperson explained, "[w]e thought it would be a different outcome." Id. A juror claimed the jury made a "mistake" in answering one of the questions, but that it was because "we don't know the law and we're not expert[s] at the law." Id. The District Court found that the jury had misjudged the legal outcome of its factual determinations, and that such a misjudgment was "not a reasonable ground to vacate an otherwise valid verdict." Id. at 104. The Second Circuit affirmed. Id. In Munafo, which was decided well before the Supreme Court's pronouncements in Dietz,

the jury explained quite clearly that it had "misunderstood" and "misinterpreted" one of the questions. Id. at 107. Such is not the case here.

Defendant's attempts to characterize the second verdict form as allowing the jury to issue a substantive revision of its first verdict are unavailing. In fact, as this Court proclaimed after the second verdict form was read, "I also think the fact that they found against the plaintiff for retaliation and also for promissory estoppel suggests that they really did go through the evidence and make independent judgments, as I told them they had to on each of the counts." (Tr. 3361.)

Indeed, "[t]here is no benefit to imposing a rule that says that as soon as a jury is free to go a judge categorically cannot rescind that order to correct an easily identified and fixable mistake, even as the jurors are still in the courtroom collecting their things." Dietz, 136 S. Ct. at 1896. Accordingly, this Court's decision to allow the jury to reconvene after being immediately notified of an error in their initial verdict form is not grounds for a new trial.

2. Legal Standard for Discrimination

Just as it did at the charging conference, Defendant argues that the jury was not properly instructed on the appropriate NYCHRL standard for discrimination because the "motivating

factor" standard was not used. (Def.'s Mot. at 18-20.) Defendant claims that the jury should have been told that "unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision." (Def.'s Mot. at 19 (citing Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 127 (2012).)

"Jury instructions are erroneous if they mislead the jury or do not adequately inform the jury of the law. It is axiomatic, however, that a jury charge should be examined in its entirety, not scrutinized strand-by-strand." Uzoukwu v. City of New York, 805 F.3d 409, 414 (2d Cir. 2015) (citing SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 119 (2d Cir. 2006)).

In its jury instructions, this Court read directly from the New York City Administrative Code Section 8-107 outlawing discrimination. (Tr. 3281.) As relevant here, the Court went on to explain:

> The Plaintiff need only show that she has been treated less well than other employees, at least in part, because of her race, or gender, or national origin, or religion. Defendant has no burden of proof here.
>
> If you find that Plaintiff has not met her burden of showing such less favorable treatment attributable at least in part to her race, or her gender, or her national origin, or her religion, then you must find against her on her intentional discrimination claim.

If, however, you find that the Plaintiff has shown by a
preponderance of the evidence that the Defendant has
treated her less well than others, at least in part
because of her race, or her gender, or her national
origin, or her religion, the Defendant may present
evidence of its legitimate, non-discriminatory reasons
to show its conduct was not caused by discrimination.
Here, the Defendant presented its reasons for its
employment decisions regarding Plaintiff, namely, Dr.
Greengard's scientific disagreements with Plaintiff and
the personality conflicts that developed because
Plaintiff would not accept Dr. Greengard's guidance and
feedback. Again, the Defendant has no burden of proof
here.

When applying this standard, however, you must be mindful
that the NYCHRL is not a "general civility code."

. . .

The Plaintiff still bears the burden of showing that the
Defendant's conduct, viewed from the point of view of a
reasonable employee, includes a discriminatory motive.
It is not enough that a Plaintiff has an overbearing or
obnoxious boss. To the extent Plaintiff emphasizes that
she subjectively felt "humiliated," "degraded," and
"isolated" by the perceived slights of the Defendant,
mere personality conflicts must not be mistaken for
unlawful discrimination. She must show that she has been
treated "less well" at least in part "because of her
gender, or her race, or her national origin, or her
religion."

(Tr. 3281-3283.)

The Court's instructions were correct as a matter of law.

The Court instructed nearly verbatim from the standards set

forth in Mihalik. See Mihalik v. Credit Agricole Cheuvreux N.

Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013) ("To establish a

gender discrimination claim under the NYCHRL, the plaintiff need

only demonstrate by a preponderance of the evidence that she has

30

been treated less well than other employees because of her

gender. . . . When applying this standard, however, district

courts must be mindful that the NYCHRL is not a 'general

civility code.' . . . The plaintiff still bears the burden of

showing that the conduct is caused by a discriminatory motive.

It is not enough that a plaintiff has an overbearing or

obnoxious boss. She must show that she has been treated less

well at least in part 'because of her gender.'" (emphasis in

original) (internal citation and quotations omitted)); see also

id. at 110 n.8 ("[T]he NYCHRL simplified the discrimination

inquiry: the plaintiff need only show that her employer treated

her less well, at least in part for a discriminatory reason.").

The Court told that jury that the "Plaintiff still bears the

burden of showing that the Defendant's conduct . . . includes a

discriminatory motive." (Tr. 3283.)[13]

Nor is Defendant's argument availing that the Court

erroneously instructed the jury under McDonald-Douglas burden-

shifting framework and put a burden on Defendant to prove its

legitimate, non-discriminatory reasons for its treatment of

Plaintiff. (Def.'s Mot. at 20.) Yet again, the Court instructed

nearly verbatim from Mihalik. See 715 F.3d at 110 n.8 ("While it

---

[13] Defendant's citations to Zarda v. Altitude Express, Inc., 883 F.3d 100, 112 (2d Cir. 2018) (en banc) are inapposite because that case dealt exclusively with the Federal Title VII standard.

is unclear whether McDonnell Douglas continues to apply to
NYCHRL claims and, if so, to what extent it applies, the
question is also less important because the NYCHRL simplified
the discrimination inquiry: the plaintiff need only show that
her employer treated her less well, at least in part for a
discriminatory reason. The employer may present evidence of its
legitimate, non-discriminatory motives to show the conduct was
not caused by discrimination, but it is entitled to summary
judgment on this basis only if the record establishes as a
matter of law that 'discrimination play[ed] no role' in its
actions.").

        Accordingly, the jury was instructed properly on the
standard for intentional discrimination under the NYCHRL.

    3. Deposition and Expert Testimony

        Defendant next argues that the jury was improperly
instructed on the role of deposition versus live testimony and
also on the importance of statistical evidence. (Def.'s Mot. at
20-21.) Yet a complete review of the record shows that this is
not the case.

        Defendant claims Plaintiff's counsel should not have been
permitted to state in closing arguments, "none of the principal
actors for the defendant actually came to court. All of their
testimony was given eight or nine years ago by way of

deposition. I'm not going to go into why some of them appeared
and why some of them didn't." (Tr. 3218-3219.) But the Court
promptly cut Plaintiff's counsel off by stating, "That would be
good if you didn't." (Tr. 3219.) Moreover, the Court instructed
the jury that statements of counsel were not evidence. (See Tr.
3265-3266 ("Arguments by lawyers are not evidence, because the
lawyers are not witnesses . . . .").) The Court also clearly
instructed that a "deposition is sworn recorded testimony made
in advance of trial . . . Such testimony is entitled to the same
consideration and is to be judged as to credibility, insofar as
possible weighted, and otherwise considered by the jury in the
same way as if the witness had been present and had testified
from the witness stand." (Tr. 3265-3266.)

A "trial court has discretion in the style and wording of
jury instructions," Care Travel Co., Ltd. v. Pan Am. World
Airways, Inc., 944 F.2d 983, 996 (2d Cir. 1991), so long as the
instructions do not
"mislead[ ] the jury as to the proper legal standard, or . . .
adequately inform the jury of the law." Owen v. Thermatool
Corp., 155 F.3d 137, 139 (2d Cir. 1998) (internal quotation
marks omitted). The instructions given here were unequivocal in
directing the jury to value live and deposition testimony
equally.

The same principle applies to the Court's instructions concerning expert testimony. Defendant argues that it was improper for the Court to tell the jury in its jury instructions, "As you consider the statistical evidence, remember that just because pure chance does not seem to account for a situation, this does not necessarily mean that race or national origin or gender or religion are the most likely explanations." (Tr. 3276.) Defendant claims that the Court should not have referred to race, national, origin, or religion in this instruction because Dr. Grivoyannis, Plaintiff's statistical expert, only testified on statistical gender disparities. (Def. Mot. at 21.) Yet the instruction—made in the broader context of how to consider statistical evidence on the whole—was merely stating generally that the jury should not infer causation between the lack of chance and statistical evidence of all types of discrimination asserted throughout trial. A generalized instruction such as that given above does not result in error.[14] See Pan Am. World Airways, Inc., 944 F.2d

[14] Regardless of the Court's instruction, it is also unclear how the jury could have even considered statistical evidence in finding for Plaintiff on her race/national origin claim because Dr. Grivoyannis only addressed disparities in gender. Similarly, the Court told the jury that they were not required to consider statistical evidence at all. (See Tr. 3274-3275 ("Even though an expert is allowed to give his or her opinion, you are not required to agree with that opinion. As in the case of other witnesses, the expert's credibility and the weight you choose to give to his or her testimony are for you to determine.").)

at 996 ("[A] trial court has discretion in the style and wording
of jury instructions.")

   Defendant is also not entitled to a new trial based on the
testimony of Dr. Goldstein. Defendant claims the testimony of
Dr. Goldstein, Plaintiff's psychiatric expert, should have been
stricken in its entirety because it came to light that he had
examined Plaintiff after 2010 and had not informed Defense
Counsel that he had done so. (Def.'s Mot. at 24). Defendant
claims the lack of disclosure was impossible to cure without
striking the testimony in its entirety. (Id.) Yet a cure was
possible by stipulation, which is exactly what Defendant agreed
to at trial. The stipulation, read into the record before the
jury, stated that the Parties had agreed that Dr. Goldstein's
testimony "was based only on his interviews of plaintiff Effat
Emamian in June 2010, and as indicated in his deposition on July
19, 2010." (Tr. 3165.) No error occurred. See United States v.
Samet, 466 F.3d 251, 254 (2d Cir. 2006) ("Application of the
rules [of evidence] . . . is committed to the district court's
broad discretion."); see also id. ("Thus, we will reverse only
where a ruling to admit or exclude evidence is 'manifestly
erroneous' and as such constitutes an 'abuse of discretion.'"
(citing Phoenix Assocs. III v. Stone, 60 F.3d 95, 100 (2d Cir.
1995)).

4. Verdict Form Contents

Next, Defendant claims Question One of the Verdict Form was misleading. Defendant claims the Form should have included an option for "N/A" when it asked the jury which protected statuses (race/national origin, gender, religion) Plaintiff had proven by a preponderance of the evidence. Defendant claims that this suggested that the jury was required to find for Plaintiff on at least one of her protected characteristics. (Def.'s Mot. at 22.)

This argument fails. The form clearly asked "[w]hich of the protected statuses, <u>if any</u>, do you find unanimously that the Plaintiff proved by a preponderance of the evidence . . . . ?" (Special Verdict Form at 2 (emphasis added)). The inclusion of "if any" clearly denotes a choice for the jury not to check any options. Moreover, the "formulation of special verdict questions rests in the sound discretion of the trial judge." <u>Cash v. Cty. of Erie</u>, 654 F.3d 324, 340 (2d Cir. 2011) (citing <u>Shcherbakovskiy v. Da Capo Al Fine, Ltd.</u>, 490 F.3d 130, 141 (2d Cir. 2007)).

The same principle applies to Defendant's unsupported contention that the ordering of the two parts of Question 1 was misleading. Defendant sought to reverse the order of Question 1, and have the "causation" part of the question ("Did the Plaintiff prove by a preponderance of the evidence that Defendant intentionally discriminated against her at least in

part because of her race/national origin, and/or gender, and/or religion,") come before the "protected status" part of the question ("Which of the protected statuses, if any, do you find unanimously that the Plaintiff proved by a preponderance of the evidence: The University treated her less well, [at] least in part, because of her: race/national origin. . . ."). (Special Verdict Form 2 at 1-2). The ordering of this Question was practical: it first asked the jury to see if discrimination occurred based on a protected status (if any); next, the jury was asked if that discrimination was (at least in part) the cause for disparate treatment. Regardless, this Court exercised its "sound discretion" in its formulation of the Verdict Form questions, and no error occurred. Cty. of Erie, 654 F.3d at 340.

   5. Back Pay

      Defendant argues next that Plaintiff is not entitled to back pay for a second term because she was employed on a fixed, three-year term appointment. (Def.'s Mot at 12.) According to Defendant, the jury should not have been instructed to consider a back pay award after her first term.

      Dr. Emamian was appointed as a Research Assistant Professor in Dr. Greengard's Laboratory effective August 1, 2004 with a salary of $70,000 per year. (Pl.'s Ex. 44.). The appointment was for a term of three years, expiring in 2007. The appointment

could be renewed at the discretion of the University for another three-year term. (Id.; see also Def.'s Ex. U13 at 5-6.) After trial, the jury awarded $250,000 in back pay through July 31, 2010. (Special Verdict Form 2 at 4). The jury awarded no back pay for any period of time following July 2010. (Id.)

Defendant claims Plaintiff is not entitled to back pay after 2007 because renewal of Plaintiff's contract was not automatic. (Def.'s Mot at 12.) Plaintiff counters that were it not for the University's discrimination, her term would have been renewed. Plaintiff claims it was reasonable for her to expect renewal and claim back pay damages past 2007. (Pl.'s Opp'n at 16.)  Unlike the Fifth and Eleventh Circuits, the Second Circuit has not squarely addressed whether back pay is eligible for term-contract employees who reasonably expect reemployment.[15]

Other employees in Dr. Greengard's lab, such as Dr. Svenningsson, Dr. Flajolet, and Dr. Heiman, had their contracts renewed or were promoted. (Def.'s Ex. W13.) It was therefore not unreasonable for Plaintiff's counsel to argue that Dr. Emamian

---

[15] Compare Welch v. Univ. of Tex. & Its Marine Sci. Inst., 659 F.2d 531, 535 (5th Cir. 1981) (back pay ineligible beyond any contracted, fixed-term amount because such an award is unduly speculative) with Walker v. Ford Motor Co., 684 F.2d 1355, 1361-62 (11th Cir. 1982) (back pay may be awarded if Plaintiff can prove economic injury beyond fixed-term, such as where "contracts of similarly situated employees had been renewed, or [] the employer had made a promise of continued employment.").

expected renewal of her contract but for her discrimination, and that she was entitled to damages for a renewed term. See Leibowitz v. Cornell Univ., 584 F.3d 487, 501 (2d Cir. 2009) ("[W]here an employee seeks renewal of an employment contract, non-renewal of an employment contract constitutes an adverse employment action for purposes of Title VII and the ADEA.").[16]

This Court left it to the jury, as a question of fact, whether non-renewal was an adverse employment action. The Court asked the jury to what extent, and for what period (if any), Plaintiff may be entitled to back pay. As the Court indicated in its jury instructions:

> If you determine that Defendant discriminated and/or retaliated against plaintiff, then you must determine the amount of damages that Defendant's actions have caused plaintiff.
>
> You may award as actual damages an amount that reasonably compensates Plaintiff for any lost wages and benefits, taking into consideration any increases in salary and benefits that she would have received had she not been discriminated or retaliated against.
>
> This is called "back pay" or "actual damages."
>
> The parties disagree as to the appropriate time frame for you to consider when determining back pay. Plaintiff argues that, just as with other members of Dr. Greengard's lab, Dr. Emamian's term could have been renewed or extended beyond 2010, were it not for the Defendant's alleged discrimination or retaliation. The Defendant argues that if back pay damages are to be

---

[16] While the Court acknowledges that renewal was at the discretion of the University, failure to exercise the discretion could itself constitute the University's discriminatory, adverse action.

considered at all, they should be limited to a period of three years, from July 31, 2007 through July 31, 2010, based on the language in Plaintiff's Exhibit 44, which is the contract.

If you award back pay damages, you should consider the "actual, and not merely speculative, consequences" of Defendant's unlawful discrimination or retaliation.

(Tr. 3289-3290.)

Given that most of Dr. Emamian's co-workers were given renewals, it was reasonable for the Court to instruct the jury on the possibility of Dr. Emamian's renewal. It was for the jury to weigh the likelihood of that possibility and assess damages based on the reasonableness of Dr. Emamian's expectation. The jury's award of $250,000.00 for back pay through 2010, or roughly $83,332.00 a year for three years, appears supported by the record as well: Dr. Flajolet was receiving $84,000.00 as of 2005. (Def.'s Ex. W13 at 3.) The jury also refused to assign back pay damages beyond 2010, indicating that they considered the appropriate time frame for back pay seriously (i.e., that they may have found it too speculative to assume that Dr. Emamian would have received a promotion beyond 2010 after renewal of her initial appointment).

Therefore, the jury's award for back pay should not be set aside as a matter of law and a new trial should not be granted. The back pay award is upheld.

6. Remittitur of Emotional Distress Damages

Defendant moves for remittitur of the jury's award of $2,000,000.00 in emotional distress damages. Because the Court finds that a $2,000,000.00 award deviates materially from what would be reasonable compensation under New York law, this Court remits the emotional damages award from $2,000,000.00 to $200,000.00.

Beginning in 2005, Dr. Emamian testified that she began having difficulty sleeping and started to pull her hair several times a day from her head, legs, and even face. (Tr. 389-390.) She began receiving mental health treatment in September 2005 after her primary care physician diagnosed her with generalized anxiety disorder and trichotillomania. (Tr. 391-392.) She testified that the experience made her want to "die," that she continues to feel perpetually "anxious," and that she continues to have difficulty sleeping, which she never suffered from prior to joining Dr. Greengard's lab. (See, e.g., Tr. 392; 447.) Dr. Emamian further testified that she suffered from significant physical injuries, such as hair loss, loss of appetite, and the subsequent severe weight gain due to the use of medications for her anxiety, depression, and insomnia, and a developed sleep-medication addiction. (See, e.g., Tr. 392; 504.)

Plaintiff's psychiatric expert, Robert Goldstein, M.D., linked Dr. Emamian's prior diagnoses of generalized anxiety disorder and trichotillomania to "the overwhelming stress that she experienced at work, at her job at Rockefeller, as a result of her perceptions that she was being discriminated against and retaliated against, was what triggered her psychiatric condition." (Tr. 1297.) He also noted that, prior to her issues with Rockefeller, she "had no prior psychiatric problems of any kind." (Tr. 1297.). Even Defendant's expert, Dr. Robert T.M. Phillips, agreed with the diagnoses of generalized anxiety disorder, trichotillomania, and depression (albeit from causes other than discrimination). (See, e.g., Tr. 2736-2737.)[17]

"A federal court, in reviewing the amount of damages awarded on a state [or city] law claim, must apply New York law." Patterson v. Balsamico, 440 F.3d 104, 119 (2d Cir. 2006) (citing Gasperini v. Ctr. for the Humanities, 518 U.S. 415, 430-31 (1996)). New York law provides that jury verdicts may be set aside and new trials ordered where the jury's award "deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c) (McKinney 2018). This standard requires a more exacting review than the "shocks the conscience" standard

---

[17] The Court will not substitute its own judgment on the reliability of one witness over another, or any witness for that matter. The Court's remittitur analysis is limited to questions of law surrounding the appropriate amount of emotional distress damages for Dr. Emamian based on similar New York (and to some extent, federal) cases.

generally applied by federal courts. See Gasperini, 518 U.S. at
424. Damages for emotional distress must be "reasonably related
to the discriminatory conduct" of the defendant. In re N.Y.C.
Transit Auth., 78 N.Y.2d 207, 216 (1991).

A New York court reviewing a jury award looks to "the
duration of a complainant's condition, its severity or
consequences, any physical manifestations, and any medical
treatment." Id. at 218. In addition, the reviewing court must
determine how the award compares with other awards for similar
injuries, and whether it is supported by the evidence before the
jury. Id.; see also Meacham v. Knolls Atomic Power Lab., 381
F.3d 56, 77-78 (2d Cir. 2004) (explaining standard).

This standard appears similar to the federal, "significant
emotional distress" standard. "Emotional distress awards within
the Second Circuit can "generally be grouped into three
categories of claims: 'garden-variety,' 'significant' and
'egregious.'" MacMillan v. Millennium Broadway Hotel, 873 F.
Supp. 2d 546, 560 (S.D.N.Y. 2012).

"In 'garden variety' emotional distress claims, the
evidence of mental suffering is generally limited to the
testimony of the plaintiff, who describes his or her injury in
vague or conclusory terms, without relating either the severity
or consequences of the injury." Id. (citations omitted). "Garden
variety" emotional distress claims "generally merit $30,000.00

to $125,000.00 awards." <u>Quinby v. WestLB AG</u>, No. 04 CIV.7406

WHP, 2008 WL 3826695, at *3 (S.D.N.Y. Aug. 15, 2008); <u>see</u> <u>also</u>,

<u>e.g.</u>, <u>Legg v. Ulster Cty.</u>, No. 109CV550-FJS-RFT, 2017 WL

3668777, at *12 (N.D.N.Y. Aug. 24, 2017) (reducing $200,000.00

Title VII hostile work environment claim to $75,000.00 where

plaintiff provided no testimony from a medical professional on

mental state); <u>Johnson v. Strive E. Harlem Emp't Grp.</u>, 990 F.

Supp. 2d 435, 457 (S.D.N.Y. 2014) (lack of corroborative

testimony or evidence of lasting emotional impact supported

reduction of $250,000.00 award to $80,000.00 in Title VII case);

<u>Kinneary v. City of New York</u>, 536 F. Supp. 2d 326 (S.D.N.Y.

2008) (reducing $125,000.00 federal and state award to

$25,000.00 in part because of lack of corroborative medical

testimony).

"'Significant' emotional distress claims differ from the

garden-variety claims in that they are based on more substantial

harm or more offensive conduct, are sometimes supported by

medical testimony and evidence, evidence of treatment by a

healthcare professional and/or medication, and testimony from

other, corroborating witnesses." <u>MacMillan</u>, 873 F. Supp. 2d at

560 (citations omitted). Significant emotional distress damages

usually range from $50,000.00 to $200,000.00. <u>Compare</u> <u>Welch v.</u>

<u>United Parcel Serv., Inc.</u>, 871 F. Supp. 2d 164, 191-97 (E.D.N.Y.

2012) (high significant emotional distress damage award of

$200,000.00 appropriate in NYSHRL retaliation case where Plaintiff presented testimony from himself and psychiatric expert documenting emotional and physical symptoms) with Thorsen v. Cty. of Nassau, 722 F. Supp. 2d 277, 293 (E.D.N.Y. 2010) (citing Phillips v. Bowen, 278 F.3d 103, 111–12 (2d Cir. 2002)) (reviewing awards exceeding $200,000.00 especially with a First Amendment violation); see also Khan v. Hip Cent. Lab. Servs., Inc., No. CV-03-2411 (DGT), 2008 WL 4283348, at *11–12 (E.D.N.Y. Sept. 17, 2008) (noting overall significant emotional distress damage award range).

"Finally, 'egregious' emotional distress claims generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff." MacMillan, 873 F. Supp. 2d at 560 (citations omitted). Such awards can exceed $200,000.00. See, e.g., Albunio v. City of New York, 67 A.D.3d 407, 408 (2009) (affirming $491,706.00 award in state sexual discrimination case where plaintiff's career was ruined because defendant spread claims that plaintiff was a gay child molester and plaintiff became suicidal for years).

As the Second Circuit has noted, however, "[a]wards for mental and emotional distress are inherently speculative. There is no objective way to assign any particular dollar value to distress." Stampf v. Long Island R.R. Co., 761 F.3d 192, 205 (2d

Cir. 2014). "New York cases vary widely in the amount of damages awarded for mental anguish." Id. (quoting Lore v. City of Syracuse, 670 F.3d 127, 177 (2d Cir. 2012)); see also Meacham, 381 F.3d at 78 (compiling discrimination cases in which New York courts reduce awards for mental anguish to $30,000.00 or below as well as cases in which New York courts uphold awards of more than $100,000.00).

A review of applicable case law shows that an award of $2,000,000.00 is excessive. Even the most egregious cases do not approach that figure. See Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 151-52 (2d Cir. 2014) (upholding a federal award of $1,320,000.00 where plaintiff had been subject to "an extraordinary and steadily intensifying drumbeat of racial insults, intimidation, and degradation" over several years—including being referred to as a "n-----" by 30% of his co-workers and finding in his car a stuffed toy monkey with a noose around its neck—that caused post-traumatic stress disorder, short-term adjustment disorder, depression, a panic disorder and multiple hospitalizations); Brady v. Wal-Mart Stores, Inc., 455 F. Supp. 2d 157, 198 (E.D.N.Y. 2006) (remitting jury award of $2,500,000.00 million to $600,000.00 under state standard where defendant repeatedly discriminated against boy based on his cerebral palsy condition, and boy suffered from mental breakdowns, serious emotional trauma, failure at school, and

other effects); see also Caravantes v. 53rd St. Partners, LLC,
No. 09 CIV. 7821 RPP, 2012 WL 3631276, at *24 (S.D.N.Y. Aug. 23,
2012) (awarding $150,000.00 in damages at bench trial where
plaintiff sought $400,000.00 after plaintiff's superiors
sexually assaulted him over a period of years and he developed
"serious depression," social withdrawal, insomnia, lowered
energy level, impaired concentration, suicidal thoughts, sleep
disturbance, and appetite disturbances).

The Court finds that Plaintiff's claims for emotional
distress fall into the intermediate, "significant emotional
distress" category, given Plaintiff's own testimony regarding
her mental state, her trichotillomania and physical
manifestations of her emotional suffering, as well as the
corroborative medical testimony she presented. The Court finds
an award of $200,000.00 to be appropriate.

Dr. Emamian's case seems most similar to that of the
plaintiff in Lore v. City of Syracuse, 670 F.3d 127 (2d Cir.
2012). In that case, a female police officer sued the City of
Syracuse under Title VII and the NYHRL under a disparate
treatment theory, alleging that she was paid less than her male
counterparts and demoted to lower-ranked positions. Id. at 141.
She also alleged she was not given the same technology as other
officers, was deprived of overtime assignments, and received
harassing messages after filing her complaint. Id. at 142. The

jury returned a verdict of $150,000.00 for emotional distress damages. After the district court denied conditional remittitur, the Second Circuit affirmed and found the amount appropriate. Id. at 177. The Court noted that the plaintiff's evidence of her emotional distress "included her own testimony and the testimony of her mother, that Lore had suffered, inter alia, tension headaches, abdominal pain, insomnia, anxiety, and depression. They testified that whereas Lore had been a gregarious and vivacious person before the events of 2000 and 2001, she thereafter suffered from stress, had stomach problems, and became reclusive. . . . Her mother testified that Lore looked like a ghost, "'wouldn't talk' to anyone, and 'cried and cried and cried.'" Id. at 178. The Court also noted Lore's "medical treatment, the physical side effects of which included vomiting and diarrhea," and depression. Id.

While the Lore Court noted that while "[n]either cases arising under federal law nor those arising under state law provide a clear line as to whether an award of $150,000.00 for emotional distress on the basis of a trial record such as that created in the present case deviates so materially from what would be reasonable," the Second Circuit previously "has, however, affirmed awards of $125,000.00 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted only of 'testimony

establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress,' as well as awards of $175,000.00 each where in addition there were 'either physical sequelae'— i.e., secondary physical results or consequences—'or professional treatment.'" Id. (citing Meacham, 381 F.3d at 77).

Indeed, courts in similar instances have remitted or upheld awards to the low six-figure range. See, e.g., Meacham, 381 F.3d at 77, (upholding district court's remittitur of state law age discrimination damage award from $1,100,000.00 to $125,000.00 because it did not "materially deviate" from other state verdicts, despite lack of corroborative medical testimony); Bouveng v. NYG Capital LLC, 175 F. Supp. 3d 280 (S.D.N.Y. 2016) (remitting $500,000.00 award to $150,000.00 in state and city serial sexual harassment and misconduct case where plaintiff suffered mentally); Welch, 871 F. Supp. 2d at 191-97 (significant emotional distress damage award of $200,000.00 appropriate in NYSHRL retaliation case where Plaintiff presented testimony from himself and psychiatric expert documenting emotional and physical symptoms); McGrory v. City of New York, 2004 WL 2290898, at *15-16 (S.D.N.Y. 2005) (remitting $533,390.00 award to $100,000.00 in state racial retaliation case where plaintiff presented evidence of his emotional distress through the testimony of several witnesses, including his psychiatrist); Watson v. E.S. Sutton, Inc., No. 02 CIV. 2739

(KMW), 2005 WL 2170659, at *15–16 (S.D.N.Y. Sept. 6, 2005)
(remitting $500,000.00 federal award for emotional distress to
$125,000.00 with plaintiff presenting evidence of her depression
and medication); Shea v. Icelandair, 925 F. Supp. 1014, 1022–25
(S.D.N.Y. 1996) (remitting $250,000.00 federal and state award
to $175,000.00 where plaintiff and expert testified that
defendant aggravated symptoms of Plaintiff's Parkinson's disease
and cardiac troubles); see also Patterson v. Balsamico, 440 F.3d
104, 120 (2d Cir. 2006) (upholding $100,000.00 jury verdict
under New York law, even though plaintiff provided no
corroborative medical testimony, for plaintiff who was subjected
to racial slurs 12 times and was assaulted with mace).[18]

     Courts have, in some instances, upheld awards exceeding
$200,000.00 for "significant" emotional distress. See, e.g.,
Marchisotto v. City of New York, 2007 WL 1098678, at *10
(S.D.N.Y. 2007) (upholding $300,000.00 emotional distress award
in federal and state case where psychologist corroborated that
Plaintiff suffered from posttraumatic stress disorder and major
depressive disorder and could no longer perform sexually); Katt
v. City of New York, 151 F. Supp. 2d 313, 320-371 (S.D.N.Y.

---

[18] The cases cited by Plaintiff are largely inapposite. They either
involve defamation and antitrust claims (neither of which are asserted
here) and documented lost earning potential, see, e.g., Purgess v.
Sharrock, 33 F.3d 134 (2d Cir. 1994), or egregious § 1983 cases
involving brutal physical assaults of prisoners. See, e.g., Tatum v.
Jackson, 668 F. Supp. 2d 584, 587, 603 (S.D.N.Y. 2009).

2001) (Court upheld federal $400,000.00 award where plaintiff suffered numerous forms of sexual harassment and psychologist testified she was "barely functioning" and suffered from "severe headaches, stomach ailments, diarrhea," and infections); Quinn v. Nassau Cty. Police Dep't, 53 F. Supp. 2d 347 (E.D.N.Y. 1999) (Court upheld $250,000.00 for emotional distress on federal sexual harassment claim where social worker corroborated plaintiff suffered from severe emotional and physical symptoms stemming from distress).[19]

Given the above, and the trial record as a whole, this Court finds that $200,000.00 is "maximum amount that would be upheld . . . as not excessive" and would not "materially deviate" from reasonable compensation in comparable cases. Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1330 (2d Cir. 1990); N.Y. C.P.L.R. § 5501(c) (McKinney 2018); see also Mendez v. Starwood Hotels & Resorts Worldwide, Inc., 746 F. Supp. 2d 575, 601 (S.D.N.Y. 2010). ("[W]hen a court is convinced that the jury's award is entirely out of proportion to the Plaintiff's injury, and was motivated by sympathy rather than by evidence of harm, remittitur is the appropriate remedy.").

---

[19] Upholding a jury verdict of $250,000.00 is of course not the same as remitting a jury verdict of $2,000,000.00.

Should Plaintiff not accept the remitted damages verdict, Defendant's Motion for a New Trial is GRANTED on emotional distress damages only.

IV.  Conclusion

For the reasons stated herein, Defendant's Motion for Judgment as a Matter of Law under Rule 50(b) is DENIED in all respects.

Defendant's Rule 59 Motion for a New Trial on emotional distress damages is GRANTED only in the event Plaintiff does not accept the remitted damages award for emotional distress of $200,000.00. Defendant's Motion for a New Trial is DENIED on all other grounds. Plaintiff's back pay award of $250,000.00 is upheld.

Within 30 days of the date of this Opinion, Plaintiff shall inform the Court whether she accepts the remitted $200,000.00 amount for emotional distress damages, or whether the Court shall grant Defendant's Motion for a New Trial on emotional distress damages.

SO ORDERED.

Dated:    June 8, 2018
          New York, New York


                                    _____
                                    Deborah A. Batts
                                    United States District Judge